**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Gilreath Family & Cosmetic Dentistry, Inc.  :
d/b/a Gilreath Dental Associates, on behalf  :
of itself and others similarly situated,    :        CIVIL ACTION FILE
     Plaintiff,                          :        NO. _____
                                         :
vs.                                         :
                                         :
                                         :
The Cincinnati Insurance Company,           :
     Defendant.                          :
                                         :

## COMPLAINT – CLASS ACTION

Plaintiff Gilreath Family & Cosmetic Dentistry, Inc. d/b/a Gilreath Dental Associates ("Gilreath" and "Plaintiff"), on behalf of itself and all others similarly situated, by and through counsel, files this Class Action Complaint against Defendant The Cincinnati Insurance Company ("Cincinnati Ins." and "Defendant"), alleging as follows:

## INTRODUCTION

This action arises from Defendant's practice of collecting premiums from Plaintiff and other similarly situated dental professionals to insure against the prospective loss of business income when business operations are suspended through no fault of the insured. Now, amid the COVID-19 pandemic, when federal, state,

and local government "stay at home" orders and social distancing guidelines and recommendations have affected approximately 95% of the U.S. population to prohibit all non-essential and elective medical procedures, Defendant is denying dental office's business income loss claims, asserting that COVID-19 is not a covered loss. But as shown by the policy terms and conditions on the policy issued to Plaintiff and others similarly situated, the business income losses attributed to COVID-19 are covered by the policy language and due to be paid.

## PARTIES, JURISDICTION, & VENUE

1.    Plaintiff Gilreath is a Georgia Corporation that maintains its principal business address in Cobb County, Georgia.

2.    Defendant Cincinnati Ins. is an Ohio for-profit insurance company with its principal place of business in Cincinnati, Ohio.

3.    Defendant Cincinnati Ins. is authorized by the Office of Insurance and Safety Fire Commissioner to sell Property & Casualty in Georgia. Defendant Cincinnati Ins. maintains its registered agent in Gwinnett County, Georgia, located in Northern District of Georgia.

4.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than

100 putative class members ("class members"), and minimal diversity exists because many class members are citizens of a different state than Defendant.

5.    This Court has personal jurisdiction over Defendant because Defendant maintains a registered agent in Gwinnett County, Georgia.

6.    This Court has personal jurisdiction over Defendant because Defendant is authorized to sell insurance in Georgia, regularly conducts business in Georgia, and has sufficient minimum contacts in Georgia.

7.    Defendant intentionally availed itself of this jurisdiction by marketing and selling insurance products and services in Georgia, and by accepting and processing payments for those products and services within Georgia.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §1391, because a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## GENERAL ALLEGATIONS

### The Policy and Its Language

9.    Defendant Cincinnati Ins. sells a variety of insurance products stating that it is "in the business of helping when disaster strikes – helping policyholders recover financially; helping families and businesses restore their lives and livelihoods; helping communities regain a sense of stability." See, Cincinnati Ins.'s

3

website "About Us" page (www.cinfin.com/about-us) (last visited May 26, 2020).

10.    Defendant Cincinnati Ins. claims that it looks "to pay all that is due under [the policyholders'] policy after a covered loss." *Id.*

11.    Defendant Cincinnati Ins. markets itself by representing that "[w]hen it comes to paying claims, we'll look for coverage – not exceptions, helping to keep your business running in the event of a claim." See, Cincinnati Ins.'s website "Businesses" page (www.cinfin.com/business-insurance) (last visited May 26, 2020).

12.    Defendant Cincinnati Ins. markets and sells business insurance expressly to dentists and dental practices through its "Dentist's Package."

13.    Defendant Cincinnati Ins. markets and offers to dentists and dental practices business income insurance ("BII") in order to:

    a.  Pay valued daily loss of income up to $500 per day (up to 30 days);

    b.  Pay excess over the valued daily loss of actual loss sustained that is documented (up to 12 consecutive months);

    c.  Replace lost rental income based on actual loss sustained (up to 12 consecutive months);

    d.  Pay extra expenses necessary to continue operations, based on actual loss sustained (up to 12 months); and

e.  Provide extended business income based on actual loss sustained (up to
    12 months).

14.    Plaintiff Gilreath is a dental practice located at 200 White Street,
Marietta in Cobb County, Georgia, that has provided dental care to its patients for
nearly 50 years.

15.    Plaintiff Gilreath employs two dentists and 10 full time staff to serve
all patient populations and provides a range of dental services, including but not
limited to, general and cosmetic dentistry to families and individuals throughout the
community.

16.    Understanding that certain events outside its control could lead to an
interruption of business and lost revenue, Plaintiff Gilreath purchased a policy of
insurance from Defendant Cincinnati Ins. ("the policy") being policy number ECP
028 41 48. See, Ex. A, The Policy.

17.    The policy has effective dates of October 29, 2017 through October 29,
2020. *Id.*

18.    Plaintiff faithfully paid policy premiums to Defendant specifically to
provide, among other things, additional coverages in the event of business
interruption or closures by order of civil authority.

19.    At all times material to this action, the policy was in full force and

effect.

20.     The policy includes "Business Income" coverage which promises to pay for loss due to the necessary suspension of operations following a loss. Ex A, Business Income (And Extra Expense) Coverage Form, pdf page 105.

21.     The policy includes "Civil Authority" coverage which promises to pay for loss caused by the action of a civil authority that prohibits access to the Covered Property. *Id.*, policy page 2 of 9 (pdf page 106).

22.     The policy also provides "Extra Expense" coverage, which promises to pay the expense incurred to minimize the suspension of business and to continue operations. Ex. A, policy page 1 of 9 (pdf page 105).

23.     Unlike some policies that provide Business Income coverage (also referred to as "business interruption" coverage), the policy does not include, and is not subject to, any exclusion for losses caused by the spread of viruses or communicable diseases.

24.     In the Business Income (and Extra Expense) Coverage Form, Defendant agreed to pay for Plaintiff's actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration" caused by direct physical loss or damage. A "slowdown or cessation" of business activities at the Covered Property is a "suspension" under the policy, for which

Defendant agreed to pay for loss of Business Income during the "period of restoration" that begins at the time of direct physical loss or damage. Ex. A, policy page 9 of 9 (pdf page 113).

25.    "Business Income" means net income (or loss) before tax that Plaintiff and the other Class Members would have earned if no physical loss or damage had occurred, taking into account normal operating expenses incurred. Ex. A, policy page 5 of 9 (pdf page 109).

26.    In the Business Income (and Extra Expense) Coverage Form, Defendant also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property. Ex. A, policy page 1 of 9 (pdf page 105).

27.    "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property. *Id.*

28.    In the Business Income (and Extra Expense) Coverage Form, Defendant also agreed to "pay for the actual loss of 'Business Income'" that Plaintiff sustains "and necessary Extra Expense . . . caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property near the Covered Property, the civil authority prohibits access

7

to property immediately surrounding the damaged property, the Covered Property is within the prohibited area, and the civil authority action is taken "in response to dangerous physical conditions." Ex. A, policy page 2 of 9 (pdf page 106).

**The COVID-19 Pandemic and
Plaintiff's Required Suspension of Business Operations**

29.    On March 11, 2020, the World Health Organization declared that COVID-19 constituted a global pandemic.

30.    The scientific community, and those personally affected by the virus, recognize COVID-19 as a cause of real physical loss and damage. It is clear that contamination of Plaintiff's Covered Property would be a direct physical loss requiring remediation to clean the surfaces of the Covered Property.

31.    The National Institutes of Health issued warnings that the virus that causes COVID-19 remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel. See, March 17, 2020 New Release, "New Coronavirus Stable for Hours On Surfaces" (www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces) (last visited May 26, 2020).

32.    The presence of COVID-19 has caused civil authorities throughout the country, including civil authorities in Georgia with jurisdiction over Plaintiff, to issue orders requiring the suspension of business at a wide range of establishments

8

(the "Closure Orders").

33.    In early March 2020, the Georgia Department of Public Health determined that COVID-19 "is spreading throughout communities" and laboratory testing confirmed more than 60 cases of COVID-19 had surfaced in Georgia, requiring the implementation of certain restrictions to limit the spread.

34.    On March 14, 2020, Georgia Governor Brian Kemp declared a Public Health State of Emergency and, April 2, 2020 issued an Executive Order, requiring "all residents and visitors of the State of Georgia are required to shelter in place within their homes or places of residence … taking every possible precaution to limit social interaction to prevent the spread or infection of COVID-19 to themselves or any other person…." State of Georgia Exec. Order No. 04.02.20.01 (April 2, 2020) (gov.georgia.gov/executive-action/executive-orders/2020-executive-orders)   (last visited May 26, 2020).

35.    On March 18, 2020, the Centers for Medicare and Medicaid Services ("CMS") released recommendations on Adult Elective Surgeries and Non-Essential Medical, Surgical, and Dental Procedures During COVID-19 Response.  These recommendations directed all medical providers, including dentists, delay all elective surgeries and non-essential medical, surgical, and dental procures during the 2019 COVID-19 outbreak.  "CMS Releases Recommendations on Adult Elective

9

Surgeries, Non-Essential Medical, Surgical, and Dental Procedures During COVID-19 Response" (www.cms.gov/newsroom/press-releases/cms-releases-recommendations-adult-elective-surgeries-non-essential-medical-surgical-and-dental) (last visited May 26, 2020).

36.    Further mandates to cancel or postpone elective and routine medical procedures were issued by bodies and licensing boards governing dental practices, including the CMS, American Dental Association ("ADA"), the American Medical Association ("AMA"), and the Georgia Dental Association ("GDA"),

37.    Again, on April 7, 2020, to "limit exposure of patients and staff to the virus that causes COVID-19," CMS recommended the cancellation or postponement of all non-emergent, elective treatment, and preventive medical services for patients of all ages. "Non-Emergent, Elective Medical Services, and Treatment Recommendations" (www.cms.gov/files/document/cms-non-emergent-elective-medical-recommendations.pdf) (last visited May 26, 2020).

38.    On April 8, 2020, the CDC issued further guidelines for dental practices related to elective and routine operations, recommending all dental facilities postpone elective procedures, surgeries, and non-urgent dental visits for the foreseeable future. For other healthcare facilities, CDC guidelines called for the rescheduling of all non-urgent outpatient visits and elective surgeries.

10

39.    The Closure Orders, association bulletins, governmental guidelines, recommendations, and directives consistently and unfailingly mandated dental practices to cancel or postpone treatment of all non-emergent patients. The goal of such measures was to prevent transmission of a known, dangerous virus deeply persistent in communities, cities, counties, and all states across the United States.

40.    According to the CDC, the virus that causes COVID-19 is known to remain live and viable for hours and days on "surfaces made from a variety of chemicals," including surfaces commonly found in dentist and physician offices and can be spread by asymptomatic members of the public.

41.    In Georgia, at the time of the filing of this Complaint, there have been over 43,000 confirmed COVID-19 cases and over 1,800 deaths from COVID-19.

42.    As a result of the proliferation and spread of COVID-19, and due to the resultant Declarations of Emergency, Executive Orders, and local mandates requiring the public to exercise strict social distancing practices, non-emergent, routine, and elective medical procedures were halted at all dental and medical practices in the state.

**Plaintiff's Loss – A Covered Cause of Loss and Plaintiff's Claim**

43.    Plaintiff incorporates by reference the preceding paragraphs of the Complaint as if set forth herein verbatim.

11

44.    Losses due to the COVID-19 virus pandemic are a Covered Cause of Loss that is not excluded under the policy.

45.    The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, Insurance Services Office Inc. ("ISO"), acknowledged the specter of business interruption claims arising from "the specter of pandemic." ISO Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria", at pdf page 6 (July 6, 2006) (www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-006-175-Virus.pdf) (last visited May 26, 2020). The ISO circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage.

*Id.* at pdf pages 6-7. The ISO acknowledges that reasonable claims for property

damage and business interruption arising from pandemic can be made and therefore provides a virus or bacteria endorsement for insurers who seek to exclude virus and bacterial pandemics from business interruption coverage.

46.    The COVID-19 pandemic caused direct physical loss of or damage to the Covered Property under the policy by denying use of and damaging the Covered Property and by causing a necessary suspension of operations during a period of restoration.

47.    Further, the COVID-19 pandemic renders the Covered Property unsafe, uninhabitable, or otherwise unfit for its intended use, which constitutes direct physical loss.

48.    Plaintiff's loss of use of the Covered Property constitutes direct physical loss.

49.    Beginning on or about March 14, 2020 as a result of the COVID-19 pandemic and the resultant closure orders issued by civil authorities in Georgia and the United States, Plaintiff was forced to suspend or reduce business operations at 200 White St., Marietta, Georgia with the exception of emergency dental procedures, which are a *di minimis* portion of Plaintiff's business. A substantial portion of Plaintiff's business income is derived from routine and elective dental procedures. Because people—staff, patients, community members, and others— frequent all

areas of Plaintiff's property, there is an ever-present risk that the Covered Property is contaminated and would continue to be contaminated if the business remained open to the public.

50. Because Plaintiff's practice is conducted in an enclosed building, the Covered Property is more susceptible to being or becoming contaminated, as respiratory droplets are more likely to be retained on the Covered Property and fomites within, and remain viable for far longer as compared to other facilities with open-air ventilation.

51. Plaintiff's business is also highly susceptible to rapid person-to-property transmission of the virus, and vice-versa, because the activities of the patients and the employees require them to interact in close proximity to the property and to one another. Also, dentistry requires personal contact between Plaintiff's employees and patients, which heightens the risk of COVID-19 transmission.

52. Thus, the virus physically impacts the Covered Property.

53. Plaintiff made a claim with Defendant under its policy for business interruption coverage, including business income losses and extra expenses incurred.

54. On May 13, 2020, Defendant forwarded to Plaintiff a reservation of rights stating:

> [T]here must be direct physical loss or damage to Covered Property caused by a covered cause of loss in order for the claim

14

to be covered. Covered Property generally entails your premises and business personal property. Direct physical loss or damage generally means a physical effect on Covered Property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect. Your notice of claim indicates that your claim involves Coronavirus [a.k.a. COVID-19]. However, the fact of the pandemic, without more, is not direct physical loss or damage to property at the premises.

Ex. B, Reservation of Rights Letter, page 2.

55.    However, the policy makes no mention of a "physical effect" requirement (such as deformation, permanent change in physical appearance or other manifestation of a physical effect) to establish a covered loss under the policy.

56.    Defendant, in its reservation of rights, further stated:

There are certain key elements to this coverage that are your burden to show to us. These are: damage to property other than your own that was caused by a covered cause of loss; access to the area immediately surrounding the other, damaged property is prohibited by civil authority; and the action of the civil authority is taken in response to dangerous physical conditions resulting from the damage to the other property.

*Id.*, page 7.

57.    On May 20, 2020, Plaintiff provided information to Defendant regarding the claim including:

a.  Governor Kemp's March 14, 2020 declaration of a Public Health Emergency;

b.  Governor Kemp's April 2, 2020 Executive Order;

15

c.  The Centers for Medicare and Medicaid Services March 18, 2020 recommendations regarding COVID-19;

d.  The American Dental Association's guidelines (which were incorporated by reference into other Orders); and

e.  The CDC's recommendations to limit treatment to emergency care.

Ex. C, Denial of Coverage Letter, page 2 (listing the information Defendant received from Plaintiff).

58.    On May 20, 2020 (the same day that Plaintiff provided information to Defendant), Defendant denied the claim stating:

a.  The policy required direct physical loss or damage to Covered Property at the premises or within 1,000 feet of those premises;

b.  Coverage was excluded by a pollutants exclusion in the policy; and

c.  There was no coverage for Civil Authorities action because there is "no evidence that the order was entered because of direct damage to property at other locations or dangerous physical conditions at other locations" and "the order does not restrict access to the area immediately surrounding your premises."

See, Ex. C, Denial of Coverage Letter.

## CLASS ACTION ALLEGATIONS

59.    The Cincinnati Ins. policies insuring all class members at issue in this case were uniform, with the same or substantially similar material language

60.    The policies at issue in this case do not vary substantially from policyholder to policyholder.

61.    The class member policies at issue in this case do not exclude viruses or communicable diseases.

62.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seek class certification of the following Georgia class (the "Class"):

## THE CLASS

**All persons who practice dentistry and/or dental practice groups in Georgia who purchased from Defendant a Business Owner policy of insurance, with Business Income, Civil Authority, and/or Extra Expense coverage, who were subject to federal recommended guidelines or state directives to limit, suspend, or cancel non-emergent and elective procedures during the COVID-19 pandemic.**

63.    The Class asserts claims against Defendant for Breach of Contract for Business Income coverage (Count I), Breach of Contract for Civil Authority Coverage (Count II), Breach of Extra Expense Coverage (Count III), Declaratory Relief (Count IV), and Expenses of Litigation (Count V).

64.    Pursuant to Fed. R. Civ. P. 23 (b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of claims brought under Georgia law.

17

65.    Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

66.    Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

67.    The Class meets the criteria for certification under Rule 23(a), 23(b)(2), 23(b)(3) and 23(c)(4).

68.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** The Members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. The exact number of class members is unknown to Plaintiff at this time but may be ascertained through Defendant's records. Based on the large number of Business Owner policies issued by Defendant, and the blanket denials of all claims related to business loss occasioned by COVID-19, the Class likely comprises well over 250 members throughout the state of Georgia. Affected entities' and individual insured's names and addresses are available from Defendant's records,

18

and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

69. **Commonality and Predominance: Fed. R. Civ. P. 23(a)(2).** As to the Class, this action involves common questions of law and fact which predominate over any questions affecting individual class members. The terms of Defendant's coverage, exclusions and limitations related to coverages are uniform for those contained within the proposed class, and Defendant breached the terms of those contracts pursuant to a uniform policy of denying all loss of business income claims related to COVID-19. Common questions of law and fact include, but are not limited to:

    a.  Whether Defendant's conduct breaches its Contract of Insurance;

    b.  Whether the spread of COVID-19 constitutes physical loss or damage to covered premises so as to trigger coverage for loss of Business Income under Defendant's insurance policy;

    c.  Whether the "Pollutants and Contaminants" Property Definitions section of the policy applies to COVID-19;

    d.  Whether Plaintiff and Members of the Class are entitled to damages, costs, and/or attorneys' fees from Defendant; and

e.  Whether Plaintiff and Members of the Class are entitled to compensatory damages.

70.   **Typicality. Fed. R. Civ. P. 23(a)(3).** As to the Class, Plaintiff claims are typical of other Class Members' claims because Plaintiff and Members of the Class were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class Members (*i.e.*, denying coverage for a covered loss) is the same for all Members of the Class.

71.   **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating insurance coverage claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

72.   **Fed. R. Civ. P. 23(b)(2).** Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate. Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a

20

whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to deny claims for covered losses for loss of Business Income resulting from continuing interruptions to its insured's businesses, thus making declaratory relief a live issue and appropriate to the Class as a whole.

73. **Fed. R. Civ. P. 23(b)(3).** There are questions of law and fact common to the Class that under Fed. R. Civ P. 23(b)(3) predominate over any questions solely affecting individual members of the Class, including but not limited to those common questions of law and fact identified in paragraph 69. A class action is superior to all other available methods of fairly and efficiently adjudicating this dispute. The injury sustained by each Class Member, while meaningful on an individual basis, is not of such magnitude that it is economically feasible to prosecute individual actions against Defendant. Even if it were economically feasible, requiring hundreds or thousands of injured plaintiffs to file individual suits would impose an undue burden on the court system and almost certainly lead to inconsistent judgments. By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

74. Plaintiff alleges that, based on Defendant's denial of claims for loss

of Business Income, Civil Authority and Extra Expense coverage due to the spread of COVID-19 and corresponding shelter-in-place orders, the total claims of individual class members in this action exceed $5,000,000.00 in the aggregate, exclusive of interest and costs.

<u>**COUNT I**</u>

**BREACH OF CONTRACT –
BUSINESS INCOME COVERAGE**

75.    Plaintiff realleges and incorporates the preceding paragraphs of the Complaint, as if fully set forth herein.

76.    Plaintiff bring this Count individually and on behalf of the other members of the proposed Class.

77.    The insurance policies insuring Plaintiff and class members are contracts under which Defendant was paid premiums in exchange for its promise to pay for losses for claims covered by the policy, which does not exclude viruses and/or communicable diseases from coverage or classify viruses as a pollutant.

78.    Defendant agreed to pay for Plaintiff's and class members' actual loss of Business Income sustained due to the necessary suspension of practice caused by direct physical loss of or physical damage to property at the scheduled premises.

79.    Defendant agreed to "pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage."

80.    "Business Income" means "[n]et Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and (b) Continuing normal operating expenses incurred, including payroll."

81.    COVID-19 caused direct physical loss and damage to Plaintiff's and the other class members' Scheduled Premises, requiring suspension of practice at their Scheduled Premises. Losses caused by COVID-19 thus triggered the Business Income provision of Plaintiff's and the other Business Income class members' insurance policies with Defendant.

82.    Plaintiff and the other class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

83.    By denying coverage for any Business Income losses incurred by Plaintiff and the other Business Income class members in connection with the

COVID-19 pandemic, Defendant has breached its coverage obligations under the policies.

84.     As a result of Defendant's breaches of the policies, Plaintiff and the other Business Income class members have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT II

### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE

85.     Plaintiff realleges and incorporates the preceding paragraphs of the Complaint, as if fully set forth herein .

86.     Plaintiff brings this Count individually and on behalf of the Class.

87.     Plaintiff's and class members' insurance policies are contracts under which Defendant was paid premiums in exchange for its promise to pay losses for claims covered by the policy, which does not exclude virus and/or communicable diseases from coverage or define them as a pollutant.

88.     Defendant promised to pay "the actual loss of Business Income" that a policyholder sustains "when access to [the] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [the] 'scheduled premises'".

89.     The shelter-in-place orders and mandates by relevant civil authorities

triggered the Civil Authority provision under Plaintiff's and the other class members' insurance policies with Defendant.

90.    Plaintiff and the other class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Defendant and Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

91.    By denying coverage for any practice losses incurred by Plaintiff and class members of the Civil Authority Class in connection with the COVID-19 pandemic, Defendant has breached its coverage obligations under the policies.

92.    As a result of Defendant's breaches of the policies, Plaintiff and the other class members have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT III

### BREACH OF CONTRACT –
### EXTRA EXPENSE COVERAGE

93.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

94.    Plaintiff bring this Count individually and on behalf of the Class.

25

95.    Plaintiff's and class members' insurance policies are contracts under which Defendant was paid premiums in exchange for its promise to pay losses for claims covered by the policy, which does not exclude virus and/or communicable diseases from coverage or define them as a pollutant.

96.    Defendant also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" "resulting from a Covered Cause of Loss" to the scheduled premises.

97.    "Extra Expense" means expenses necessarily incurred by a policyholder "to avoid or minimize the suspension of business and to continue 'operations'; (b) To minimize the suspension of business if you cannot continue 'operations'; and (c) To repair or replace any property; or during the period of restoration to continue normal services and operations."

98.    Due to COVID-19, Plaintiff and the other class members incurred Extra Expense at scheduled premises.

99.    Plaintiff and the other class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Defendant or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

26

100.   By denying coverage for any business losses incurred by Plaintiff and class members in connection with the COVID-19 pandemic, Defendant has breached its coverage obligations under the policies.

101.   As a result of Defendant's breaches of the policies, Plaintiff and the other class members have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT IV

### DECLARATORY JUDGMENT
### (BUSINESS INCOME, CIVIL AUTHORITY, AND/OR EXTRA EXPENSE COVERAGE)

102.   Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

103.   Plaintiff brings this Count individually and on behalf of class members who purchased Business Income, Civil Authority, and/or Extra Expenses Coverage.

104.   Plaintiff's and class members insurance policies are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the policies.

105.   Plaintiff and the Class Members have complied with all applicable provisions of the policies and/or those provisions have been waived by Defendant

27

or Defendant is estopped from asserting them, and yet Defendant has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and other members of the Business Income Class are entitled.

106.   Defendant has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether class members have filed a claim.

107.   An actual case or controversy exists regarding Plaintiff's and the other class members' rights and Defendant's obligations under the policies to reimburse them for the full amount of Business Income losses, Civil Authority and/or Extra Expense losses in connection with suspension of their practices stemming from the COVID-19 pandemic.

108.   Pursuant to 28 U.S.C. § 2201, Plaintiff and the other class members seek a declaratory judgment from this Court declaring the following:

a. Business Income losses incurred in connection with the necessary interruption of their practices stemming from the COVID-19 pandemic, are insured losses under their policies;

b. Civil Authority losses incurred in connection with the necessary

interruption of their practices stemming from the COVID-19 pandemic, are insured losses under their policies;

c.  Extra Expense losses incurred in connection with the necessary interruption of their practices stemming from the COVID-19 pandemic, are insured losses under their policies; and

d.  Defendant is obligated to pay Plaintiff and the other Class members for the full amount of the Business Income, Civil Authority and Extra Expense losses incurred and to be incurred in connection with the period of restoration and the necessary interruption of their practices stemming from the COVID-19 pandemic.

## COUNT V

## EXPENSES OF LITIGATION (O.C.G.A. § 13-6-11)

109.  Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

110.  Defendant has acted in bad faith, been stubbornly litigious, and caused Plaintiff and class members unnecessary trouble and expense by the failure to comply with the clear requirements of the policies and Georgia law.

111.  There is no legal justification for Defendant's conduct in failing to pay Plaintiff and class members claims for Business Income, Civil Authority,

and/or Extra Expense losses incurred and to be incurred in connection with the period of restoration and the necessary interruption of their practices stemming from the COVID-19 pandemic.

112.   Plaintiffs and class members are entitled to, and expressly pray for, expenses of litigation, including all attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, demands a trial by jury on all triable issues and seek judgment as follows:

A.    For an order certifying this action as a class action on behalf of the Class, with Plaintiff as class representative;

B.    For an award of compensatory damages in amounts owed under the policies and Georgia law;

C.    For all other damages according to proof;

D.    For a declaratory judgment that Defendant's policies required and continue to require Defendant to pay for the full amount of the Business Income, Civil Authority and Extra Expense losses incurred in connection with the period of restoration and the necessary interruption stemming from the COVID-19 pandemic

30

E.    For an award of attorneys' fees and expenses pursuant to O.C.G.A. § 13-6-11 and other applicable law;

F.    For costs of suit incurred herein;

G.    For prejudgment and post judgment interests on any amounts awarded; and

H.    For such other relief as this Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Respectfully submitted this May 26, 2020,

HALL & LAMPROS, LLP

*/s/ Andrew Lampros*
Andrew Lampros
Ga. Bar #432328
Christopher B. Hall
Ga. Bar # 318380
Gordon Van Remmen
Ga. Bar #215512

400 Galleria Pkwy SE
Suite 1150
Atlanta, GA 30339
Tel.: (404) 876-8100
Fax: (404) 876-3477
alampros@hallandlampros.com
chall@hallandlampros.com
gordon@hallandlampros.com

Roger W. Orlando
Georgia State Bar No. 554295
The ORLANDO Firm, P.C.
315 W. Ponce de Leon Avenue
Suite 400
Decatur, Georgia 30030
roger@orlandofirm.com
phone: (404) 373-1800

*Attorneys for Plaintiff*

Counsel for Plaintiff certifies that this Class Action Complaint is in 14-point
Times New Roman Font in compliance with the Local Rules of the Northern
District of Georgia.